UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| RANDY LARSEN, | |
| Plaintiff, | 2:04-cv-00263 JWS |
| vs. | ORDER AND OPINION |
| ROCHE LABORATORIES, INC., DAVID POLEI, *et al.*, | [Re: Motions at Docket Numbers 98 and 100] |
| Defendants. | |

## I. MOTION PRESENTED

At docket 98, defendants Roche Laboratories, Inc., and David Polei (jointly "defendants") move for partial summary judgment dismissing plaintiff Randy Larsen's claims for wrongful termination in violation of A.R.S. § 23-1501(3)(c)(ii), intentional infliction of emotional distress, and intentional interference with a contractual relationship. At docket 100, plaintiff moves for summary judgment on his claim under the Consolidated Omnibus Budget Act of 1985. Both motions are fully briefed. Oral argument was heard on September 1, 2006.

## II.  BACKGROUND

Plaintiff Randy Larsen began his employment with defendant Roche Laboratories in June 1997 as a Pharmaceutical Representative.  In June 1999, Larsen was promoted to Oncology Specialist.  Defendant David Polei became Larsen's supervisor in July 2001.

Roche Laboratories employs a process called "performance management" for managing and reviewing the performance of its sales representatives.  Roche defines performance management as a process of ongoing communications between employees and their supervisors to:

- Discuss and define job responsibilities and duties and the performance expectations necessary to perform satisfactorily;
- clarify expected levels of performance and results;
- specify how well the employee is performing;
- identify ways to strengthen and improve individual performance; and
- discuss development plans to optimize current performance and support competency development.[1]

The performance management process begins with performance planning discussions at the beginning of the review year and includes the establishment of a performance management plan ("PMP") for each sales representative.  "The formal performance management process may include a mid-year review discussion roughly six months into the review year and should include a final year-end performance

---

[1]Doc. 99, exh. D at 1.

review."[2]  "Employees who disagree with their review may indicate their reasons in writing on the review or as an attachment."[3]

In April 2002, Polei sent an e-mail to his sales representatives, including Larsen, regarding the preparation of each representative's mid-year PMP. Polei requested the sales representatives to fill out two core competency sections of their mid-year PMPs by May 15, 2002. Polei directed Larsen to complete two sections - critical reasoning and interactions. Larsen did not complete the two sections.

On July 18, 2002, Larsen, Polei, and Jacque Vontver, Roche Regional Sales Director, met for Larsen's mid-year performance review. During the meeting, Vontver requested Larsen to complete three sections of the draft PMP - knowledge, leadership, and customer focus - for Polei's review. On July 29, 2002, Larsen e-mailed his comments for the three sections to Polei.

On August 29, 2002, Larsen sent Lynn Harac, Roche's Senior Human Resources Manager, a nineteen-page letter contesting Polei's negative assessment of Larsen's performance in field trip reports, and alleging that Polei was retaliating against Larsen for talking with one of his former supervisors about Polei.[4]  In the letter, Larsen also referred to the mid-year PMP and stated that he requested Polei to comment on the sections he submitted on July 29, 2002, but that he had not heard back from Polei or

---

[2] *Id.*

[3] *Id.* at 3.

[4] Doc. 99, exh. R.

received a copy of the PMP. Larsen also requested a transfer to David Weinstein's division.

In September 2002, Vontver sent Larsen a draft of the PMP for his review. The PMP did not include Polei's comments in the leadership, knowledge, and customer focus sections. On September 4, 2002, Larsen sent an e-mail to Harac, attaching his comments for the mid-year PMP. On September 20, 2002, Larsen discussed his disagreement with Polei's draft of the mid-year PMP with Vontver. During the meeting, Vontver agreed to cut and paste Larsen's comments under "strengths" in the knowledge, customer focus, and leadership sections of the draft PMP and to send it to Polei for his review.

During October 2002, Harac and Engelhardt conducted an investigation into the allegations raised in Larsen's letter to Harac. On October 27, 2002, Larsen sent an e-mail to Engelhardt, Harac, Vontver, and Polei, which states in pertinent part:

> I believe that Mr. Polei has committed an illegal act. Under Arizona law, forgery is an illegal act. A person commits forgery if, with intent to defraud, a person falsely makes, completes or alters a written instrument. A.R.S. 13-2002(A)(1). Mr. Polei submitted my Performance Plan and Review with the apparent intent to submit it as a completed document knowing that he had omitted or deleted from the submission information that was favorable to my performance.[5]

On October 29, 2002, Steven Engelhardt, Roche's National Sales Director, Harac, Vontver, and Polei met with Larsen regarding the allegations in his grievance letter. During the meeting, Larsen was questioned about his alleged violations of

---

[5]Doc. 99, exh. V.

several Roche policies and was advised that Roche was investigating the allegations in his e-mail of October 27, 2002.

By letter dated November 15, 2002, Engelhardt and Harac informed Larsen that they had concluded their inquiry regarding Larsen's internal complaint of "discriminatory, harassing and retaliatory work conditions as demonstrated by [his] Division Manager, David Polei."[6]  Engelhardt and Harac found no "real inconsistencies" between Polei's communications and approach to Larsen and other members of his team.  Engelhardt and Harac also found that management's oversight of Larsen's activities was warranted because Larsen had violated several Roche policies and his performance was deficient in several respects.  Consequently, Larsen was informed that he would be placed on a performance improvement plan.  Engelhardt and Harac further stated that they had investigated Larsen's allegation that Polei forged his PMP and found it to be without merit.  The letter states in pertinent part:

> ...Dave simply revised the document - that is within his area of responsibility.  You do not own the PMP and it is not your document.  Additionally, we do not find any intent on David's part to change the document to defraud.  Thus, based on the facts described to us, we believe it is inappropriate to claim that a document that has been altered i[s] an act of forgery.[7]

On December 3, 2002, Roche formally placed Larsen on a performance improvement plan for violating Roche policies, demonstrating a lack of teamwork with peers, and failing to meet management's expectations regarding teamwork and behavior.  On January 2, 2003, Roche terminated Larsen's employment, alleging that

---

[6]Doc. 99, exh. W at 1.

[7]Doc. 99, exh. W at 3.

the primary reasons for his termination were Larsen's violations of Roche policies and his failure to improve his communication and teamwork with peers.

During Larsen's employment, Roche had twenty or more employees and offered company sponsored medical and dental insurance plans, in which Larsen participated. Roche was the Plan Administrator for the medical and dental insurance plans. Roche's employee benefits handbook stated that the company sponsored medical and dental plans were covered under the Consolidated Omnibus Budget Act of 1985 ("COBRA"), and that participating employees were thus eligible for an extension of their insurance coverage after termination of employment with Roche. The employee handbook also included information about employee rights under COBRA, how to obtain COBRA continuation coverage, qualifying events that trigger coverage, and the duration of COBRA coverage. Larsen received the handbook upon commencing employment with Roche.

At the time of his termination, Larsen did not receive written notice of his rights under COBRA. About one week after his termination, Larsen took his daughter to a medical appointment and learned that his insurance coverage through Roche had terminated. Larsen immediately called the benefits department at Roche and recorded his ensuing conversation with Cecylia Pirchala. A transcript of the conversation indicates that Pirchala told Larsen that his medical and dental coverage ended on his last day of employment with Roche and that he had the right to elect continued medical and dental coverage under COBRA. Pirchala told Larsen that he would receive a package from CompLink, the company that handles COBRA processing for Roche, that he needed to complete and return the package, and if he signed up for COBRA his

coverage would be retroactive to the date of his termination. Pirchala also informed Larsen that to continue his prior family coverage under COBRA would cost $785.09 per month, and that to continue his family dental coverage would cost $94.05 a month. Pirchala also informed Larsen that he had two months to elect COBRA coverage and advised him to contact his manager to find out if he was eligible for a severance package to help defray some of the costs of COBRA coverage.

Shortly after his conversation with Pirchala, Larsen obtained coverage through his wife's insurance plan. In June 2003, Larsen obtained medical coverage through Genta, his new employer. In November 2003, Roche discovered that Larsen's file had not been transferred to CompLink due to a "number of technical problems with CompLink."[8] On November 17, 2003, CompLink sent Larsen a written COBRA election notice. Larsen received the notice and elected not to purchase continued COBRA coverage.

In December 2003, Larsen filed a complaint in the Superior Court of the State of Arizona, alleging claims of wrongful termination in violation of A.R.S. § 23-1501(3)(c)(ii), intentional infliction of emotional distress, violation of his right to notice under COBRA, and intentional interference with a contractual relationship. Defendants removed this matter to federal court based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted when there is no genuine issue as to any material fact and when the moving

---

[8]Doc. 108 at 3.

party is entitled to judgment as a matter of law. The moving party has the burden to show that material facts are not genuinely disputed.[9] To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[10] Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue of fact exists by presenting evidence indicating that certain facts are disputed so that a fact-finder must resolve the dispute at trial.[11] The court must view this evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences from it in favor of the nonmoving party.[12]

### III.  DISCUSSION

Defendants move for summary judgment dismissing plaintiff's claims of wrongful termination, intentional infliction of emotional distress, and interference with a contractual relationship. Plaintiff moves for summary judgment on his claim under COBRA. Each claim is discussed below.

**A.     Wrongful Termination in Violation of A.R.S. § 23-1501(3)(c)(ii)**

Plaintiff's complaint alleges that "[p]laintiff was terminated as a result of his whistleblowing activities," namely reporting his belief that Polei violated Arizona's

---

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[10] *Id.* at 325.

[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[12] *Id.* at 255; *Soldano v. United States*, – F.3d – , 2006 WL 1897081 (9th Cir. 2006) (quoting *Olson v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004)).

forgery statute by omitting plaintiff's positive comments from his mid-year PMP.[13] Pursuant to A.R.S. § 23-1501(3)(c)(ii), an employee has a claim against an employer if the employer terminated the employee's employment in retaliation for

> the disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated...the statues of [Arizona] to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations....[14]

Defendants allege that plaintiff's wrongful termination claim "fails as a matter of law because Plaintiff cannot establish that he had a good faith reasonable belief that Mr. Polei's actions violated Arizona's forgery statute."[15]  Plaintiff alleges that he reasonably believed that Polei violated Arizona's forgery statute by omitting plaintiff's comments from his mid-year PMP because Roche's performance management policy is "an ongoing process of two-way communication between supervisors and employees," and plaintiff's prior supervisors involved him in preparing his PMPs and "incorporated his comments regarding his accomplishments, his strengths, and his weaknesses verbatim into the final PMP."[16]

---

[13]Complaint at 15, doc. 1.

[14]A.R.S. § 23-1501(3)(c)(ii).

[15]Doc. 98 at 11-12.

[16]Doc. 110 at 11.

Under A.R.S § 13-2002(A)(1), "A person commits forgery if, with intent to defraud, such person...[f]alsely makes, completes or alters a written instrument." "Alteration of a document without authority to do so may constitute a forgery."[17] Here, it is undisputed that under Roche's policy, Polei, as plaintiff's supervisor, had authority to alter plaintiff's PMP. Furthermore, in his deposition, plaintiff acknowledged that a manager was not required to include an employee's comments regarding his performance into the final PMP, but testified that the "manager should be obligated to discuss why his feelings...differ such that they would not incorporate my comments."[18] Based on the above admission, plaintiff could not have reasonably believed Polie committed forgery by not including plaintiff's positive comments about his performance into plaintiff's PMP.

Plaintiff also argues that he reasonably believed that Polei tried to pass off Polei's PMP as "work product completed and validated" by plaintiff.[19] Plaintiff does not provide any evidence in support of his allegation. Rather, the evidence shows that on September 26, 2002, Vontver sent plaintiff an e-mail specifically disavowing plaintiff's claim that Polie presented the PMP as plaintiff's work product. Vontver's e-mail states in pertinent part:

> I did not say that Dave (Polei) sent me the PMP document that you completed. I only said that the PMP document that Dave sent me did not include your comments under *Strengths* for Knowledge, Customer Focus or Leadership. Dave did indeed send the

---

[17]*State v. Rovin*, 518 P.2d 579, 580 (Ariz. App. 1974).

[18]Deposition of Randy Larsen at 53, exh. B, doc. 99.

[19]Doc. 110 at 12.

>    document to me via email.  He did not say it was the one that you
>    completed.[20]

Based on the above e-mail which plaintiff received one month before he made his whistleblower claim on October 27, 2006, plaintiff could not have reasonably believed that Polei attempted to present the PMP Polei completed as plaintiff's work product.

The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing of an element of its claim with respect to which it has the burden of proof at trial.[21] Here, plaintiff has failed to show that he had a reasonable belief that Polei committed forgery by not including plaintiff's positive comments in his PMP or by presenting the PMP as plaintiff's work product.  Because plaintiff has failed to demonstrate that he had "information or a reasonable belief" that Roche or Polie violated Arizona's forgery statute, defendants are entitled to summary judgment on plaintiff's wrongful termination claim.

**B.      Intentional Infliction of Emotional Distress**

Defendants Roche and Polei next request the court to summarily dismiss plaintiff's claim of intentional infliction of emotional distress.  Under Arizona law, the tort of intentional infliction of emotional distress requires proof of three elements.[22]  "*[F]irst*, the conduct by the defendant must be 'extreme' and outrageous'; *second*, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty

---

[20]Doc. 99, exh. T

[21]*Celotex*, 477 U.S. at 325.

[22]*Citizen Publishing Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005).

-11-

that such distress will result from his conduct; and *third*, severe emotional distress must indeed occur as a result of defendant's conduct."[23]

Plaintiff alleges that defendant Polei engaged in extreme and outrageous conduct by putting negative comments in plaintiff's field trip reports, telling plaintiff he should "float" his resume, omitting plaintiff's comments from his PMP, accusing plaintiff of performance deficiencies, holding plaintiff to standards other sales representatives were not required to meet, auditing plaintiff's expense reports, expressing his dislike of plaintiff to other members of the Division, and sending plaintiff an article titled "A word to the not-so-wise: no one is indispensable" after his employment was terminated. Plaintiff alleges that defendant Roche engaged in extreme and outrageous conduct by placing him on a performance improvement plan for unjustified reasons, terminating his employment, and failing to give him notice of his right to continuation coverage under COBRA.

Defendants allege that plaintiff's claim of intentional infliction of emotional distress fails as a matter of law because plaintiff cannot establish that defendants' actions were "extreme" and "outrageous." The court concurs. Even assuming all allegations of plaintiff's complaint are true and viewing the evidence in the light most favorable to plaintiff, defendants' conduct is not "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable."[24] As the court acknowledged in *Mintz v. Bell*

---

[23]*Id.* (quoting *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)).

[24]*Cluff v. Farmers Ins. Exchange*, 460 P.2d 666, 668 (Ariz. App. 1969)).

*Atlantic Systems Leasing Intern., Inc.*, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery of the tort of intentional infliction of emotional distress."[25]

Because plaintiff cannot establish that defendants' conduct was extreme and outrageous, the court will grant defendants' motion for summary judgment as to plaintiff's intentional infliction of emotional distress claim.

**C.     Intentional Interference with a Contractual Relationship**

Plaintiff's complaint alleges that "Defendant Polei vindictively and intentionally interfered with Plaintiff's employment contract with Defendant Roche, causing Defendant Roche to terminate Plaintiff's employment."[26] Plaintiff specifically alleges that Polei's "Field Trip Reports and other reviews influenced the decisionmakers who ultimately decided to end Mr. Larsen's employment."[27]

Defendants argue that plaintiff's claim for intentional interference with a contractual relationship fails as a matter of law because plaintiff cannot establish that "Polei acted outside the course and scope of his employment, or that he improperly interfered with Plaintiff's contract with Roche."[28] Defendants further allege that plaintiff cannot establish that Polei's interference caused the alleged breach of contact, arguing that "there is no record evidence that the relevant decision-makers, including Mr. Engelhardt and Ms. Harac, relied on Mr. Polei's statements, as opposed to their

---

[25] 905 P.2d 559, 563 (Ariz. App. 1995) (internal quotation and citation omitted).

[26] Complaint at 18, doc. 1.

[27] Doc. 110 at 17.

[28] Doc. 121 at 10.

own investigation and conclusions, in making the decision to terminate Plaintiff's employment."[29]

"The elements of a cause of action for intentional interference with contract are a contract between the plaintiff and a third party; knowledge of the defendant that the contract exists; intentional interference by the defendant which causes the third party to breach the contract; a showing that the defendant acted improperly; and a showing that damage resulted to the plaintiff."[30] The following seven factors are the basis for evaluating the propriety of the alleged interferer's motive:

> (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.[31]

"If the plaintiff is unable to show the impropriety of the defendant's conduct based on an examination of these factors, the conduct is not tortious."[32]

Plaintiff alleges but fails to provide any evidence showing that Polei acted with improper motives in assessing plaintiff's performance in field trip reports and other performance reviews, such as the PMP. Because there is no evidence of any improper motive or action cited to the court from the record, the issue of improper interference

---

[29] Doc. 121 at 11.

[30] *Barrow v. Arizona Board of Regents*, 761 P.2d 145, 152 (Ariz. App. 1988) (citing *Wagenseller v. Scottsdale Memorial Hospital,* 710 P.2d 1025 (Ariz. 1985)).

[31] *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1024 n.7 (9th Cir. 2000) (citing *Wagenseller*, 710 P.2d at 1042-1043).

[32] *Wagenseller*, 710 P.2d at 1043.

may be decided as a matter of law.[33]  Where, as here, plaintiff has failed to show the impropriety of defendant's conduct based on an examination of the seven factors cited above, defendant's conduct is not tortious.[34]

In addition, plaintiff has failed to produce any evidence establishing that Polei was a significant cause of his termination.[35]  Rather, the undisputed evidence shows that Polei did not have authority to terminate plaintiff's employment and that Harac and Engelhardt decided to terminate plaintiff's employment after they conducted an independent investigation of plaintiff's grievance letter and placed plaintiff on a performance improvement plan based on the findings of their investigation.

Because plaintiff has failed to establish a prima facie claim of intentional interference with contract, the court will grant defendants' motion for summary dismissal of plaintiff's intentional interference claim.

### D.  Violation of the Consolidated Omnibus Budget Act of 1985 ("COBRA")

Plaintiff moves the court for summary judgment on his claim that defendant Roche violated 29 U.S.C. § 1166(a)(1) by failing to "provide Larsen proper notice of his right to continue his health insurance under COBRA within 14 days of when Roche terminated his employment."  Plaintiff's complaint specifically alleges that Roche failed to give him any information about "when his health insurance would expire, when he had to elect to obtain COBRA coverage, how much the premiums would be for him and

---

[33] *Lindsey v. Dempsey*, 735 P.2d 840, 843 (Ariz. App. 1987).

[34] *Wagenseller*, 710 P.2d at 1043.

[35] *Caudle*, 224 F.3d at 1024.

for his dependents, who his carrier was, what the carrier's address was, or any other information necessary for Larsen to make an informed decision to elect to continue his health insurance."[36]  Pursuant to 29 U.S.C. § 1132(c)(1), plaintiff requests the court to award him $100 per day, as well as "pain and suffering for his inability to attend to his medical needs because he lacked the health insurance that he was otherwise entitled to continue."[37]  Plaintiff also seeks payment of his attorney's fees under 29 U.S.C. § 1132(g)(1).

Section 29 U.S.C. § 1166(a)(1) provides that at the commencement of coverage under a participating insurance plan, written notice must be given to each employee of the right to continuation coverage under COBRA.  The first notice is not at issue in this case; rather, plaintiff alleges that defendant failed to give plaintiff adequate notice of his rights under COBRA within fourteen days of his termination as is required under 29 U.S.C. § 1166(a)(4)(A).[38]  COBRA contain no specific requirements as to the form or manner in which notice must be given once a qualifying event occurs.  Courts addressing the issue of notice have generally held that  "a good faith attempt to comply with a reasonable interpretation of the statute is sufficient"[39] and that "the notice given

---

[36]Complaint at 17, doc. 1.

[37]Complaint at 18, doc 1.

[38]When, as is the case here, the employer and the plan administrator are the same entity, the employer has forty-four days from the date of the qualifying event to notify a qualified beneficiary of the right to maintain coverage.  *See Rodriquez v. International College of Business and Technology, Inc.*, 364 F.Supp.2d 40, 45 (D.P.R. 2005).

[39]*Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1383 (10th Cir. 1997) (quotation and citation omitted) (collecting cases).

must be sufficient to allow the qualified beneficiary to make an informed decision whether to elect coverage."[40]

The transcript of plaintiff's conversation with a Roche benefits representative shows that, contrary to the allegations in plaintiff's complaint, within fourteen days of his termination plaintiff received oral notice of the date his insurance expired, the period within which he had to elect continuation coverage, the approximate premiums to continue the prior coverage for himself and his children, and the identity of his medical and dental insurance carriers.[41] Plaintiff does dispute the veracity of the transcript, but rather "assumes the truth of the matters asserted therein" for the purposes of this motion.[42]

In his reply brief, plaintiff acknowledges that oral notice can be sufficient if the administrator proves it engaged in good faith attempts to comply with reasonable interpretations of the COBRA statute, but alleges for the first time that oral notice was insufficient here because defendant failed to inform him of the premium due dates, his right to elect individual coverage, and the monthly premium for individual coverage. However, based on the transcript, it appears that defendant provided plaintiff with information about continuation coverage for plaintiff and his children because plaintiff said he needed insurance coverage for himself and for his children.[43] Moreover, while it appears that defendant failed to supply plaintiff with the premium due dates for

---

[40] *McDowell v. Krawchison*, 125 F.3d 954, 958 (6th Cir. 1997).

[41] Doc. 109, exh. E.

[42] Doc. 122 at 3.

[43] Transcript at 6, doc. 109.

continuation coverage, the court finds that defendant's failure to supply the premium due dates did not prevent plaintiff from making an informed decision about whether to elect coverage under COBRA.

Moreover, even assuming that defendant failed to provide plaintiff sufficient notice of his rights under COBRA, the imposition of statutory penalties is not warranted here. Under 29 U.S.C. § 1132(c)(1), if a plan administrator fails to provide the requisite COBRA notice, a court has discretion to find the plan administrator personally liable to the beneficiary for up to $110 per day from the date of failure until the date of correction.[44] In deciding whether to assess a penalty, the court may consider bad faith or intentional misconduct by the plan administrator, the number of requests for compliance made, and the existence of prejudice to the plan participant.[45]

Here, there is no evidence that defendant acted in bad faith, nor that plaintiff suffered any prejudice. Plaintiff's complaint alleges that "[b]ecause of Roche's failure to provide the information required by federal law, Larsen lacked health insurance coverage and went without needed medical care."[46] However, the record shows that shortly after his termination, plaintiff obtained coverage through his wife's insurance plan, and then obtained coverage through his new employer about five months later. The evidence also shows that plaintiff made only one inquiry as to COBRA benefits and elected not to purchase COBRA coverage when he received written COBRA notice. For

---

[44] The maximum civil penalty was increased from $100 to $110. 29 C.F.R. § 2575.502c-1.

[45] See, e.g., Lloyd v. Hanover Foods Corporation, 72 F.Supp.2d 469, 480 (D. Del. 1999); Rodriquez, 364 F.Supp.2d at 49.

[46] Complaint at 17, doc. 1.

the reasons stated above, the court finds that an imposition of statutory penalties is not warranted here and that an award of reasonable attorney's fees is inappropriate in this case.

## IV.  CONCLUSION

For the reasons set out above, defendants' motion for partial summary judgment at docket 98 is **GRANTED**, plaintiff's motion for partial summary judgment at docket 100 is **DENIED**, and plaintiff's claims are **DISMISSED**.

DATED at Anchorage, Alaska, this 18th day of September 2006.

                                                     /s/
                                    JOHN W. SEDWICK
                        UNITED STATES DISTRICT JUDGE